**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 16-cr-00400-BLF |
| Plaintiff, | |
| v. | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |
| ERIK DAVID HANKS, | [Re: ECF 43] |
| Defendant. | |

Defendant Erik David Hanks is charged in a single-count indictment with unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). He has filed a motion to suppress evidence seized from his person and his vehicle on August 25, 2016.

The Court held an evidentiary hearing on July 19, 2018, at which it heard both witness testimony and argument of counsel. At the conclusion of the hearing, the Court DENIED the motion with a brief oral explanation as to the basis for the ruling, and indicated that a written order would follow. The Court set the matter for a further status conference on August 21, 2018.

For the reasons stated on the record at the close of the evidentiary hearing, and set forth below, Defendant's motion to suppress evidence is DENIED.

## I.    EVIDENCE PRESENTED TO THE COURT

The Government called three witnesses to testify at the evidentiary hearing, all members of the San Jose Police Department ("SJPD"): Sergeant John Barg, Officer Joseph Oliveri, and Officer Timothy Peterson. Defendant did not call any witnesses, but defense counsel cross-examined the Government's witnesses at length. The parties jointly presented two videos, only one of which contained audio. The testimony and video evidence presented to the Court is summarized below.

### A.    Sergeant Barg's Testimony

#### 1.    Direct Examination

Sergeant Barg currently is a sergeant in the SJPD's homicide unit.  Hearing Transcript ("Tr.") at 9:15-16.  He has been employed by the SJPD for eighteen years, approximately seven of which were spent working patrol.  Tr. 9:11-21.  Sergeant Barg also spent almost four years as an investigator with the SJPD narcotic and covert investigations unit.  Tr. 12:22-12:2.

In October 2016, Sergeant Barg was a Patrol Sergeant in charge of a field training program in which experienced field training officers were paired with new police officers.  Tr. 9:22-10:25.  Specifically, Sergeant Barg was in charge of field training for "District L," also referred to as "District Lincoln," which included the intersection of Monterey Road and Tully Road.  Tr. 11:14-21.  The area around that intersection is a mixed area comprising mostly commercial, retail, and industrial space, although there is some housing.  Tr. 12:7-11.  Sergeant Barg characterized the area as "a high crime area," which is "blighted by considerable street crime" including prostitution, drug dealing, burglaries, and gang problems.  Tr. 12-21.

Sergeant Barg worked the midnight shift in District Lincoln, which was from roughly 9:00 p.m. until 7:00 a.m.  Tr. 13:15-18.  He was working that shift on the night of August 24, 2016 and into the morning of August 25, 2016.  Tr. 13:19-24.  At approximately 4:00 a.m., while driving his patrol car on Monterey Road, Sergeant Barg observed a truck parked at a gas station at the intersection of Monterey Road and Tully Road.  Tr. 14:12-15:21.  The truck was not in a parking space or at a gasoline pump, but rather was parked askew next to a curb.  *Id.*  There was a bicycle on a kickstand next to the passenger door, and two people were in the truck's cab.  *Id.*  The driver appeared to be unconscious or asleep, as he was slumped over with his chin down and his eyes closed.  *Id.*  It appeared to Sergeant Barg that the person who had parked the bicycle near the passenger side of the truck may have gotten into the truck.  *Id.*  The circumstances seemed significant to Sergeant Barg, because based on his experience he knew that:  street level drug trafficking occurs in the area, many drug deals take place in parking lots of gas stations and other businesses, and many customers and drug dealers use bicycles.  Tr. 16:2-7.  Sergeant Barg concluded that there was a strong likelihood that criminal activity was occurring.  Tr. 17:4-8.

After reaching that conclusion, Sergeant Barg contacted a two-man patrol unit under his supervision, comprised of field training officer Timothy Peterson and trainee officer Joseph Oliveri, and directed them to investigate. Tr. 11:1-13, 17:9-13. Sergeant Barg did not investigate himself because as a field supervisor, he wanted to avoid becoming too involved in the investigation, and he also believed that Officer Oliveri needed experience with street level crimes. Tr. 17:14-24. Sergeant Barg parked his vehicle and waited for Officers Peterson and Oliveri to arrive. Tr. 18:10-19:3. At that time, Sergeant Barg noticed that the truck's engine was running. Tr. 19:1-5, 24-25. The fact that the engine was running contributed to Sergeant Barg's suspicion that some type of transaction was occurring between the truck's driver and the bicyclist. Tr. 19:7-15. When Officers Peterson and Oliveri arrived, Sergeant Barg asked whether they saw anything suspicious and what they believed should be done. Tr. 20:1-4. Officer Oliveri decided to make contact with the people in the truck, and approached the passenger side while Sergeant Barg approached the driver's side. Tr. 20:5-7.

Sergeant Barg asked the driver, who later was identified as Defendant Hanks, to turn off the truck and step out. Tr. 10:8-12. When Defendant complied, Sergeant Barg conducted a pat search for weapons. Tr. 13-17. Sergeant Barg found a folding knife in Defendant's right front pants pocket, removed the knife, and threw it onto the floorboard of the driver's side of the truck. Tr. 22:1-10. Officer Peterson informed Sergeant Barg that it was a gravity knife, meaning the blade can open on its own and does not have to be forced open. Tr. 23:12-16. Gravity knives are illegal to possess in California. Tr. 23:18-19.

After completing the pat-down search, Sergeant Barg directed Defendant to sit on the curb and then allowed Officer Oliveri to take the lead on the investigation. Tr. 24:4-11. Sergeant Barg continued to observe Defendant, however, and he thought Defendant might be under the influence of some substance. Tr. 24:12-25:11. Sergeant Barg also thought Defendant appeared very nervous. Tr. 25:14-19. Sergeant Barg directed Officer Oliveri to examine Defendant for sobriety. Tr. 26:10-24. Officer Oliveri did examine Defendant, although Officer Oliveri did not administer a field sobriety test. Tr. 27:1-4. Sergeant Barg testified that Defendant was arrested for possession of the illegal knife and suspicion of being under the influence of a controlled substance

while driving a vehicle.  Tr. 27:5-11.  Defendant was taken to a hospital rather than jail because he complained that he was feeling disoriented and might pass out.  Tr. 27:12-20.

After Defendant's arrest, Officer Oliveri conducted a search of the truck.  Tr. 27:23-24. Sergeant Barg testified that after Defendant was arrested, Officer Oliveri found additional contraband on Defendant's person, and that Officer Oliveri was looking for more evidence in the vehicle.  Tr. 28:1-11.  Sergeant Barg also explained that because the vehicle was going to be towed, the police conducted an inventory search.  *Id.*  When a driver is arrested, the SJPD generally will impound and tow the vehicle where there is no reasonable way to leave the vehicle legally parked.  Tr. 28:12-19.  Defendant's vehicle could not legally be left at the gas station, which was private property, for an indefinite amount of time.  Tr. 28:20-24.  The police conduct an inventory search of the vehicle before it is towed, to document the vehicle's condition and contents.  Tr. 29:3-12.  When Defendant's truck was searched, several guns, ammunition, shooting accessories, and street gang indicia were found.  Tr. 29:13-20.

### 2.    Cross-Examination

On cross-examination, defense counsel asked Sergeant Barg a number of questions regarding the gas station and nearby properties, which resulted in Sergeant Barg's testimony that: the gas station is open 24 hours a day and is well-lit; there is a large cemetery across the street where criminal activity has occurred in the past; and also across the street is a large shopping center which would have been closed at 4:00 a.m.  Tr. 30:25-32:7.  Defense counsel also showed Sergeant Barg photographs, admitted as Exhibits 3 and 4, depicting other cars parked in the same area of the gas station in which Defendant's truck was parked.  Tr. 33:13-34:22, 41:6-14.  Defense counsel showed Sergeant Barg a photograph, admitted as Exhibit 5, showing a freeze-frame from Officer Oliveri's body camera, which refreshed Sergeant Barg's recollection that the passenger got out of the vehicle while Defendant was still seated in the driver's seat.  Tr. 42:2-10.  Finally, defense counsel elicited Sergeant Barg's testimony that Defendant was cooperative when asked to turn off his vehicle's engine and produce identification; Sergeant Barg did not observe any glass smoking pipes of other drug paraphernalia in the truck; Sergeant Barg did not smell methamphetamine or marijuana on Defendant; and Sergeant Barg did not recognize or have any

information about Defendant at the time of the initial contact. Tr. 42:11-43:9.

### 3. Redirect Examination

On redirect examination, Sergeant Barg confirmed his prior testimony that the gas station was well-lit, and he was able to see Defendant slumped over in the car. Tr. 47:14-21. Government counsel also showed Sergeant Barg Exhibits 3 and 4 – the photographs of other cars parked at the gas station – and asked whether Defendant's truck was parked in the same manner. Tr. 48:1-18. Sergeant Barg responded in the negative, explaining that while the cars in the photographs were unoccupied and parked in a parallel manner along the curb and going with the flow of traffic, Defendant's truck was occupied, with the engine running, at an angle to the curb and going against the flow of traffic. Tr. 48:18-49:12.

### 4. Recross-Examination

On recross-examination, defense counsel asked Sergeant Barg whether Defendant was detained when Sergeant Barg approached with other officers and asked Defendant to turn off his vehicle's engine. Tr. 54:24-55:10. Sergeant Barg confirmed that Defendant was detained. *Id.*

## B. Officer Oliveri

### 1. Direct Examination

Officer Oliveri began his employment with the SJPD in April 2016. Tr. 57:6-18. In August 2016, he was a recruit in the field training program. Tr. 19-22. His field training officer was Officer Peterson, his supervisor was Sergeant Barg, and his training district was District Lincoln. Tr. 59:2-17, 63:6-10. Officer Oliveri worked four days a week on the midnight shift from 9:00 p.m. at night to 7:00 a.m. in the morning. Tr. 63:3-64:3. He had been patrolling District Lincoln for approximately four months at the time of Defendant's arrest. Tr. 63:15-22. Officer Oliveri described the intersection of Monterey Road and Tully Road as a high crime area, stating that based on his patrolling experience he knew that typical crimes included prostitution, weapons, drugs, and gang-related crimes. Tr. 64:4-22.

During his training, Officer Oliveri's supervisors were working with him to get better at recognizing potential violations of the law. Tr. 60:14-23, 62:1-10. On August 25, 2016, at approximately 4:00 a.m., Sergeant Barg sent him a message over his on-board computer, stating

that a suspicious vehicle was parked at the gas station located on the corner of Monterey Road and Tully Road. Tr. 65:8-66:6. Officer Oliveri had noticed the vehicle approximately an hour earlier. Tr. 66:7-10. He and Officer Peterson drove to the gas station, where Sergeant Barg was already on-scene. Tr. 67:13-68:6. As Officer Oliveri pulled into the gas station, he noticed that two people were seated in the truck in question, one sitting low and somewhat slumped over in the driver's seat, as though he might be asleep, and the other in the passenger seat. Tr. 69:10-70:25. Officer Peterson stated that he recognized the passenger from a past narcotics related call. Tr. 70:8-23. The truck was not parked at a fuel pump or in a parking space, but rather was parked askew at a curb. Tr. 71:6-19. There was a bicycle parked next to the truck. Tr. 72:14-20. Officer Oliveri assumed that the truck's passenger had arrived on the bicycle and gotten into the truck. Tr. 72:21-73:3. The totality of those circumstances caused Officer Oliveri to believe that drug activity might be occurring. Tr. 73:4-7.

Officer Oliveri and Officer Peterson approached the passenger side of the truck and asked the passenger to get out of the vehicle. Tr. 73:8-16. Officer Oliveri performed a pat-down search of the passenger, looking for concealed weapons. Tr. 73:14-74:4. At some point during the incident, Officer Oliveri activated his body camera. Tr. 74:10-13. Officer Oliveri did not find any weapons on the passenger, and he directed the passenger to sit on the nearby curb. Tr. 75:9-15. Officer Oliveri then began speaking with Defendant, who already was out of the truck and already had been frisked by Sergeant Barg. Tr. 75:21-76:12. Officer Peterson brought it to Officer Oliveri's attention that a knife had been found on Defendant. Tr. 77:1-3.

At that point in Officer Oliveri's testimony, the parties played a video excerpt from Officer Oliveri's body camera, admitted as Exhibit 1. Tr. 77:4-79:5. The video shows Officer Peterson explaining to Officer Oliveri that the knife found on Defendant was a gravity knife, which is illegal in California. It then shows Officer Oliveri telling Defendant that the knife is illegal. The transcript of the audio portion of the video previously was submitted to the Court as Defendant's Exhibit D. After the video clip was shown to the Court, Officer Oliveri testified that Officer Peterson and Sergeant Barg informed him during the incident that the knife found on Defendant was a gravity knife, which is illegal in California. Tr. 79:8-81:2. Officer Oliveri also testified that

6

he then told Defendant that it was a misdemeanor for Defendant to have the knife, and that he arrested Defendant for possession of the knife. Tr. 81:3-12. In addition, Officer Oliveri stated that Defendant was displaying symptoms of stimulant use, including slow, slurred speech, sweating, twitching, nervousness, and nausea. Tr. 81:20-22. Defendant's symptoms worsened during the course Officer Oliveri's interaction with Defendant, to the point where Defendant complained of nausea and had difficulty standing. Tr. 83:10-18, 87:14-20. Officer Oliveri believed that even if the illegal knife had not been found, Defendant could have been arrested for being under the influence of a controlled substance. Tr. 84:1-3. An ambulance was called to evaluate Defendant. Tr. 87:21.

Following Defendant's arrest for possession of the knife, Officer Oliveri searched Defendant and found another knife on his person as well as a small bag of methamphetamine. Tr. 84:4-11. Office Oliveri also searched his vehicle, which was impounded. Tr. 87:22-88:21. Defendant's truck contained a loaded shotgun, two loaded .38 revolvers, knives, a bag of codeine pills, gang indicia, and a stolen license plate. Tr. 89:1-5.

### 2. Cross-Examination

Defense counsel began her cross-examination of Officer Oliveri by playing another portion of the video from Officer Oliveri's body camera, Exhibit 1. Tr. 90:11-24. Defense counsel then took Officer Oliveri through his arrival at the gas station, contact with the truck's passenger, and contact with Mr. Hanks. Tr. 91:2-98:22. Officer Oliveri testified consistently with his direct testimony. *Id.*

### 3. Redirect Examination

On redirect, Government counsel questioned Officer Oliveri further about Defendant's symptoms of being under the influence of a controlled substance, and sought to play a portion of Officer Oliveri's body camera from the period after Defendant was arrested. Tr. 99:3-100:15. Defense counsel objected on the basis that anything post-arrest was irrelevant to the motion to suppress, which does not challenge the officers' post-arrest conduct. Tr. 100:10-23. The post-arrest portion of the video ultimately was not played. Officer Oliveri reiterated his earlier testimony that even if Defendant had not possessed the illegal knife, his objective symptoms of

being under the influence would have provided an adequate reason to arrest him.  Tr. 104:21-3.

### 4.    Recross-Examination

On recross-examination, defense counsel elicited testimony from Officer Oliveri that, prior to Defendant's arrest, Officer Oliveri did not observe a narcotics transaction; Defendant denied using drugs and was compliant; and no drugs or drug paraphernalia were found on Defendant's passenger.  Tr. 108:8-109:4.

### C.    Officer Peterson

### 1.    Direct Examination

Officer Peterson was a both a patrol officer and a field training officer in August 2016, the time of the events in question.  Tr. 111:12-20.  Sergeant Barg was his supervisor and Officer Oliveri was his trainee.  Tr. 112:1-2.  Officer Peterson worked in District Lincoln, which includes the intersection of Monterey Road and Tully Road.  Tr. 13-18.  Officer Peterson characterized that intersection as being a dangerous area, noting that people move in and out of nearby shelters, housing, and encampments, and that there is a lot of substance abuse and drug activity.  Tr. 113:17-23.

In the early morning hours of August 25, 2016, Sergeant Barg sent a message to Officers Peterson and Oliveri, directing them to meet him at the gas station at the intersection of Monterey Road and Tully Road.  Tr. 115:18-116:8.  When they arrived, Officer Peterson saw a truck parked near the gas station's exit.  Tr. 116:21-25.  It was not in front of the pumps, or the air or water, or the convenience store.  Tr. 117:3-10.  The driver – Defendant – was slumped over and Officer Peterson recognized the passenger from previous contacts in which the passenger admitted to smoking methamphetamine.  Tr. 117:11-118:12.  There was a bicycle on a kickstand outside the passenger door of the vehicle.  Tr. 117:1-2, 119:9-13.  The combination of the neighborhood, the time – approximately 4:00 a.m. – the position of the vehicle, the driver being slumped over, the bicycle, and the identity of the passenger led Officer Peterson to conclude that narcotics activity was occurring in the vehicle, either use or sales.  Tr. 119:22-120:3.

Officers Oliveri and Peterson parked their car, and while Officer Oliveri was speaking with Sergeant Barg, Officer Peterson walked over to the truck and greeted the passenger, then stepped

back to allow Officer Oliveri to handle the investigation.  Tr. 120:10-15.  Officer Peterson testified that he told Sergeant Barg about his familiarity with the passenger.  Tr. 120:4-9.  Officer Oliveri approached the passenger side, while Sergeant Barg approached the driver's side.  Tr. 121:2-8.  Officer Peterson observed Sergeant Barg get Defendant out of the vehicle, conduct a pat-down search, remove a knife, and throw the knife onto the driver's side floorboard.  Tr. 121:9-17.  The knife opened partially as it flew.  Tr. 121:18-24.  Officer Peterson went over to the truck and picked the knife up to see if it had opened due to malfunction or if it was designed to deploy due solely to gravity.  Tr. 122:3-19.  Officer Peterson stated that it is illegal to possess a gravity knife in California.  Tr. 122:20-23.  Officer Peterson was able to open the knife with very little effort, as the blade deployed while Officer Peterson was holding the body of the knife.  Tr. 123:1-5.  Officer Peterson communicated that information to Officer Oliveri to see whether he would pick up on the violation and how he would move forward.  Tr. 123:7-12.  Officer Peterson believed that the proper way to move forward was to arrest Defendant and take him into custody.  Tr. 123:13-15.  Officer Oliveri did arrest Defendant.  Tr. 123:16-17.

Defendant was searched incident to arrest, and he began to appear ill, sweating profusely and saying that he was going to throw up.  Tr. 123:19-124:2.  Officer Peterson thought Defendant may have ingested narcotics or something else.  Tr. 124:6.  However, no field sobriety test was conducted, because Defendant already had been arrested and would not be driving.  Tr. 125:1-12.  Officer Peterson testified regarding the normal procedures for impounding a vehicle when the driver is arrested, and explained that an inventory search would be conducted both for safety reasons and to protect the SJPD from liability.  Tr. 125:18-22.

The Government then played a portion of video from Officer Peterson's body camera, which was admitted as Exhibit 2.  Tr. 125:23-126:24.  There was no audio.  Tr. 126:7.  The video showed that when Sergeant Barg tossed the knife found on Defendant, the blade partially deployed.  Tr. 126:11-127:16.

### 2.    Cross-Examination

On cross-examination, defense counsel questioned Officer Peterson about the report he wrote, in which he failed to mention that the truck's driver was slumped over in the seat.  Tr.

9

129:15-21. Officer Peterson also stated that he had never arrested the truck's passenger and had never seen him act violently. Tr. 129:22-131:6. Officer Peterson was not familiar with Defendant. Tr. 131:7-8. He did not observe Defendant do anything erratic or threatening. Tr. 131:25-132:4. When Sergeant Barg threw the knife he took from Defendant during the pat-down search, Officer Peterson did not see the knife hit the floorboard, and he did not know whether the knife hit the brake pedal or gas pedal, or what caused the blade to deploy. Tr. 133:15-134:3.

### 3. Redirect Examination

On redirect examination, Officer Peterson clarified that it was Officer Oliveri's responsibility to write the primary report in the case and that he had written only a supplementary report. Tr. 134:9-18. Officer Peterson also stated that he observed the knife blade partially deploy while it was in the air after Sergeant Barg threw it. Tr. 134:22-135:2. Officer Peterson picked up the knife to determine whether it was designed to open that way – by gravity – or whether it was not designed to open that way but was malfunctioning. Tr. 135:5-136:3.

## II. DISCUSSION

Following the presentation of evidence, defense counsel clarified that the motion to suppress was focused on the legality of the officers' initial contact with Defendant. Tr. 136:22-24. Counsel argued that Sergeant Barg lacked the reasonable suspicion necessary to justify ordering Defendant out of his vehicle and conducting the pat-down search which resulted in discovery of the illegal gravity knife. Tr. 138:5-8. Defense counsel also argued that the retrieval of the gravity knife from the truck's floorboard after it was thrown there by Sergeant Barg constituted a further search which was not supported by any articulable reason or probable cause. Tr. 138:9-12.

In response, the Government's counsel argued that under the totality of the circumstances there was reasonable suspicion to believe that Defendant was involved in illegal conduct, such as a drug transaction. Tr. 139:23-140:18. The Government pointed to Ninth Circuit authority holding that where drug activity is suspected it is reasonable to believe that the suspects may be armed and dangerous. Tr. 140:19-22. Moreover, the Government asserted that even if the pat-down search had not been conducted and the gravity knife had not been found, discovery of the weapons was inevitable because the officers had probable cause to arrest Defendant for being under the

influence and such arrest would have resulted in a search of Defendant's vehicle. Tr. 143:2-5. Finally, the Government responded to defense counsel's suggestion that the retrieval of the knife constituted an illegal search by pointing out that the knife already had been seized and that it was in plain view on the truck's floorboard. Tr. 143:8-17.

The Court addresses the parties' arguments in turn.

### A. There was Reasonable Suspicion for the *Terry* Stop

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An officer may conduct such a stop only "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). If the officer also has a reasonable fear that the persons with whom he is dealing may be armed and dangerous, the officer may conduct a pat-down search to discover weapons which may be used against the officer. *Terry v. Ohio*, 392 U.S. 1, 31 (1968).

When determining whether reasonable suspicion existed for a particular stop, the court "must look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (internal quotation marks and citation omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal quotation marks and citation omitted). An officer's reliance on a mere "hunch" is insufficient to justify a stop. *Id.* However, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.*

Applying these standards, the Court has no difficulty concluding that under the totality of circumstances in this case, Defendant's detention was supported by an objectively reasonable, articulable suspicion that Defendant was involved in criminal drug activity. Sergeant Barg, Officer Oliveri, and Officer Peterson all testified credibly, and consistently, that Defendant's truck

was parked at a gas station at 4:00 a.m., askew against a curb rather than at a pump or in a parking space; the gas station is located in a high-crime area; there were two individuals in the truck; the driver appeared to be slumped over and perhaps asleep; there was a bicycle on a kickstand outside the truck's passenger door, suggesting that someone had ridden up on the bicycle and gotten into the passenger side of the truck; and the truck engine was running. Officer Peterson recognized the person in the passenger seat as an individual who previously had admitted to using methamphetamine, although it is unclear whether or if Officer Peterson communicated that fact to Sergeant Barg. Officer Peterson testified that he did communicate the fact to Sergeant Barg, but Sergeant Barg did not mention it in his testimony. However, Sergeant Barg testified that he knew, based on his years of experience, that many drug deals take place in parking lots of gas stations and other businesses, and many customers and drug dealers use bicycles.

The Ninth Circuit has found the existence of reasonable suspicion in other cases involving similar facts. For example, in *United States v. Salcido*, the Ninth Circuit affirmed the district court's denial of a motion to suppress evidence obtained during an investigatory stop of a sport utility vehicle ("SUV") in which the defendant was a passenger. *United States v. Salcido*, 341 Fed. App'x 344 (9th Cir. 2009). The officers testified that the SUV's headlights were off when the officers saw it in the darkened parking lot of a post office at about midnight, when the post office was closed. *Id.* at 345. The officers were aware of previous reports of mail theft at the post office and found it unusual that the SUV was in the lot at that time of night. *Id.* While there may have been a legitimate explanation for the SUV to be there – *e.g.*, dropping mail into a postal collection box – a determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. *Id.* In the present case, the facts known to Sergeant Barg in the present case are even more compelling than those found sufficient to support reasonable suspicion in *Salcido*.

At the hearing, defense counsel cited a Fourth Circuit case, *United States v. Black*, 707 F.3d 531 (4th Cir. 2013), arguing that it is factually similar to the present case. In *Black*, police officers observed a lone driver, Dior Troupe, sitting in his vehicle at a gas station and then pulling out of the gas station. *Id.* at 534. The officers had not seen Troupe pull into the gas station and did not know what he had done there before they noticed him. *Id.* They followed Troupe to a

12

parking lot, where he met up with five other men who were speaking and laughing together. *Id.*
More officers were called to the scene. *Id.* at 535. One officer recognized a man in the group as
someone with prior felony drug arrests. *Id.* The officers then approached the group, at which
point Troupe motioned to his hip to indicate that he had a firearm in a holster on his hip, in plain
view. *Id.* It is legal in North Carolina, where the incident occurred, for a person to openly carry a
firearm. *Id.* The officers secured Troupe's gun and frisked him and the other men. *Id.* The
Fourth Circuit held that the totality of the circumstances – Troupe's presence at the gas station, the
prior arrest history of another man in the group, Troupe's lawful possession of a firearm, the out-
of-state identification of another man in the group, the fact that it was night, and the high-crime
neighborhood – failed to support reasonable suspicion for the *Terry* stop and frisk. *Id.* at 539.

Defendant's reliance on *Black* is misplaced. While *Black* did involve a vehicle and a gas
station, the Fourth Circuit found that the explanation by one of the officers that he suspected drug
trafficking when he observed Troupe's car at the gas station "borders on absurd" because "there
was no one else in the vehicle, and it defies reason to believe that Troupe was engaged in drug
trafficking – an act that by definition involves transmitting drugs to another person." *Black*, 707 at
539. In the present case, of course, Sergeant Barg and the other officers observed Defendant
sitting in a vehicle with another man under circumstances suggestive of a drug crime, as discussed
above. Because *Black* was based on substantially different facts, the holding of the case is
inapplicable here.

**B.     There was Reasonable Suspicion for the Pat-Down Search**

Defendant argues that even if the initial contact was lawful, Sergeant Barg had no basis for
asking him to step out of the truck or conducting a pat-down search. However, the Ninth Circuit
has held that where an officer reasonably suspects that an individual is involved in narcotics
activity, it also is reasonable for the officer to suspect that the individual may be armed. *See, e.g,*
*United States v. Davis*, 530 F.3d 1069, 1082-83 (9th Cir. 2008) ("Because officers reasonably
suspected that Richard Davis was involved in narcotics activity, it was also reasonable for them to
suspect that he might be armed."); *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080,
1086 (9th Cir. 2000) ("Because the police reasonably suspected Maggio of dealing in narcotics, it

was not unreasonable to believe that he might be armed."). As discussed above, there were numerous circumstances supporting reasonable suspicion of narcotics activity. Accordingly, the Court is satisfied that the pat-down search comported with the Fourth Amendment, *Terry*, and its progeny.

### C.    There was Probable Cause for Arrest based on the Gravity Knife

Sergeant Barg's lawful pat-down search resulted in the seizure of an illegal gravity knife, which constituted probable cause to arrest Defendant. Defendant does not dispute that his possession of the knife was illegal or that it constituted probable cause for arrest. Nor does Defendant dispute the officers' authority to conduct a search incident to arrest or an inventory search. Accordingly, based on the foregoing, the Court concludes that Defendant's arrest was lawful and that the weapons in his truck are admissible because they were discovered during a search incident to arrest and/or during an inventory search of the vehicle.

Defendant argues that Officer Peterson's recovery of the knife from the truck's floorboard was a new search and seizure requiring separate justification. However, Defendant cites no authority for the proposition that a weapon which is seized by police officers, and placed in the Defendant's vehicle to get it out of the way during a pat-down search, cannot be picked up again by the officers absent new justification.

Moreover, "police may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains contraband." *United States v. Collins*, No. 16-CR-00244-SI-1, 2018 WL 306696, at *3 (N.D. Cal. Jan. 5, 2018). Officer Peterson saw the knife taken from Defendant partially deploy when it was tossed in the truck, and on that basis he suspected that it might be an illegal gravity knife.

### D.    Inevitable Discovery Doctrine

The Government argues that even if the pat-down search had not occurred, and the gravity knife had not been found, the officers had probable cause to arrest Defendant for being under the influence of a controlled substance. The Government argues that had Defendant been arrested for that crime, his truck would have been subject to an inventory search and the weapons inevitably would have been discovered.

"The inevitable discovery doctrine is an exception to the exclusionary rule." *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986). "For the exception to apply, the prosecution must show by a preponderance of the evidence that the contraband or other material seized would have been discovered inevitably by lawful means." *Id.* Sergeant Barg, Officer Oliveri, and Officer Peterson all testified credibly that Defendant displayed symptoms of drug use. It is undisputed that during the course of Defendant's detention and subsequent arrest, he complained of nausea and ultimately was transported from the scene in an ambulance. Based on this record, the Court concludes that the Government has satisfied its burden of showing that the weapons in Defendant's truck would have been discovered through lawful means even absent the pat-down search which led to his arrest.[1]

## III.  ORDER

Defendants' motion to suppress evidence is DENIED.

Dated:  August 9, 2018

_____
BETH LABSON FREEMAN
United States District Judge

---

[1] The Court notes that once Defendant was transported in the ambulance, the officers would have impounded his car even if he had not been arrested. Both Sergeant Barg and Officer Peterson testified regarding impound procedures, and in particular that a vehicle would not be left on private property but would be impounded. Accordingly, it appears that Defendant's truck would have been impounded, and subjected to an inventory search, even absent his arrest.